**CITY OF LAS CRUCES, Plaintiff,**

v.

**EL PASO ELECTRIC COMPANY, Defendant.**

Nos. Civ. 2:95–385 LCS/JHG, Civ. 2:95–485 LCS.

United States District Court,
D. New Mexico.

Oct. 23, 1995.

Nann M. Houliston, Las Cruces City Attorney's Office, Las Cruces, NM, William L. Lutz, Martin, Lutz & Brower, Las Cruces, NM, for plaintiff.

Jane C. Cohen, David S. Cohen, Jill Z. Cooper, Cohen & Cohen, Santa Fe, NM, Thomas A. Sandenaw, Jr., Las Cruces, NM, David F. Graham, D. Cameron Findlay, Mark B. Blocker, Sidley & Austin, Chicago, IL, for defendant.

### OPINION AND ORDER

SMITH, United States Magistrate Judge.

**THIS MATTER** comes before the Court on several motions by the parties in these two cases:

(1) Defendant El Paso Electric Company's (EPEC) Motion to Dismiss in 95–CV–385, filed March 24, 1995, in U.S. Bankruptcy Court [in Doc. # 1];

(2) EPEC's Motion to Consolidate 95–CV–385 and 95–CV–485, filed May 4, 1995 [Doc. # 7 in both cases];

(3) Plaintiff City of Las Cruces' (City) Motion for Abstention or Remand in 95–CV–485, filed May 30, 1995 [Doc. # 16];

(4) EPEC's Motion for Summary Judgment in 95–CV–485, filed May 3, 1995 [Doc. # 3]; and

(5) EPEC's Motion for Certification to the New Mexico Supreme Court in 95–CV–485, filed June 19, 1995 [Doc. # 26].

After the motions were fully briefed and after oral argument, the Court ruled on these pending motions in open court at the August 25 and the August 31, 1995 motions hearings, with the exception of EPEC's Motion for Certification. This Opinion and Order sets forth in detail the Court's rulings given in the two hearings. The Court will at this time reserve its ruling on the Certification motion. If there are any discrepancies between the Court's rulings in open court and this Opinion and Order, the rulings set forth herein are controlling.

### FACTUAL BACKGROUND OF 95–CV–485

This case arises out of the City's desire to condemn the electric utility system serving the municipality of Las Cruces from EPEC and to introduce a municipally-operated electric utility. EPEC, a privately-owned Texas corporation, has operated the utility system in Las Cruces for over fifty years and currently provides electric service in various parts of southcentral New Mexico, including the communities of Las Cruces, Hatch and Mesilla, and the counties of Doña Ana, Luna, Sierra and Otero. EPEC's New Mexico ratepayers outside of Las Cruces municipal boundaries consume power that is transmitted or distributed over electric lines located within Las Cruces: it is all part of an integrated electric utility system. The City, a municipal corporation organized under the laws of New Mexico, exercises home rule authority pursuant to the New Mexico Constitution, Article X, Section 6, and has implemented a plan to purchase or acquire EPEC's electric utility system located within municipal boundaries. If the City is successful in gaining possession of the utility system, EPEC would still be obligated to provide electricity to county users living outside of the city limits.

On September 3, 1991, the Las Cruces City Council passed Ordinance No. 1247, whereby the City Council pronounced its resolve to create a municipal electric utility. On July 5, 1994, the City Council adopted Resolution No. 95–001, which called for a special election on the following question:

Shall the City of Las Cruces acquire, through negotiated purchase or eminent domain, an electric utility including, but not limited to, distribution, subtransmission facilities for the purpose of providing electricity to the citizens of Las Cruces?

The special election was held on August 30, 1994, with the electorate approving the proposition. On September 6, 1994, the City Council adopted Resolution No. 95–071, accepting the results of the August 30 election. On April 3, 1995, the City Council adopted Resolution No. 95–254, which "determined that condemnation of El Paso Electric's distribution system and related facilities serves

the public interest." (Shirley Clark Aff. at 2).

The procedural history of this case begins January 8, 1992, when EPEC filed a petition under Chapter 11 of the federal bankruptcy laws in the United States District Court for the Western District of Texas, Austin Division. On November 24, 1994, an order by the bankruptcy court granted the City's motion to lift the automatic stay so that the City could proceed to take action against EPEC in state or federal court on issues related to the City's quest to acquire the municipal electric utility system.

Thereafter, the City filed an action in the Third Judicial District for the State of New Mexico on April 7, 1995, Case No. CV–95–301. In that action the City sought declaratory judgment as to the City's right of eminent domain with respect to EPEC's electric distribution system within the municipality. On May 3, 1995, EPEC filed a Notice of Removal from state court to the United States District Court for the District of New Mexico, Case No. 95–CV–485, based on diversity of citizenship jurisdiction.

At this point, a number of motions were filed: (1) on May 3, 1995, EPEC filed its Motion for Summary Judgment; (2) on May 4, 1995, EPEC filed a Motion to Consolidate this case (95–CV–485) with 95–CV–385; (3) the City moved for Abstention or Remand to state district court on May 30, 1995; and (4) EPEC filed a Motion for Certification of the question of the City's eminent domain authority to the New Mexico Supreme Court on June 19, 1995. On July 25, 1995, pursuant to 28 U.S.C. § 636(b), the parties consented to the United States Magistrate Judge presiding over all further proceedings, including final disposition of the case.

### FACTUAL BACKGROUND IN 95–CV–385

In March 1983, the City and EPEC entered into a ten-year franchise agreement, whereby the City received franchise payments from EPEC in exchange for EPEC's right to use, occupy and rent the City's streets, alleys, rights-of-way, and other public grounds to provide electricity to City consumers. Just prior to the expiration of the franchise contract, the parties entered into a one-year agreement which essentially continued the terms of the previous franchise contract. Since the expiration of this second agreement on March 18, 1994, EPEC has continued to provide electrical service to municipal users and use the City's thoroughfares without making any franchise payments to the City.

On February 22, 1995, the City filed a complaint in the United States Bankruptcy Court for the Western District of Texas, Austin Division, seeking recovery of the unpaid franchise fees from EPEC since the termination of the second franchise agreement. The City alleged four counts in its complaint: (1) breach of an implied contract; (2) specific performance; (3) unjust enrichment; and (4) trespass. EPEC countered by filing a Motion to Dismiss on March 24, 1995.

On April 4, 1995, the bankruptcy court granted the City's Motion to Withdraw Reference to the bankruptcy court and the case was transferred to this Court. EPEC then filed a Motion to Consolidate the two cases, 95–CV–385 and 95–CV–485, on May 4, 1995. On July 11, 1995, the parties consented to the jurisdiction of the United States Magistrate Judge for all proceedings, including final disposition of both cases.

### HEARINGS ON THE MOTIONS IN 95–CV–385 AND 95–CV–485

On August 25, 1995, this Court held a motions hearing for both cases. After review of the submissions of the parties and oral argument, this Court ruled from the bench on several motions. In 95–CV–385, the Court (1) denied EPEC's Motion to Consolidate the two cases and (2) granted EPEC's Motion to Dismiss Count II of the City's Complaint (specific performance), but denied the Motion to Dismiss as to the other three counts. In 95–CV–485, the Court (1) denied the City's Motion for Abstention or Remand and (2) took under advisement EPEC's Motion for Certification and EPEC's Motion for Summary Judgment.

Another hearing was held on August 31, 1995. At that time, the Court denied EPEC's Motion for Summary Judgment in 95–CV–485; EPEC's Motion for Certification

to the state Supreme Court was taken under further advisement. This Opinion and Order embodies the Court's rulings on the motions. The Court will reserve its ruling on the one outstanding motion, the Motion for Certification to the New Mexico Supreme Court, pending resolution of the factual determination regarding "destruction" of the existing public use.

## DISCUSSION

### A. CITY'S CONTRACT CLAIMS (95–CV–385)

■ Dismissal pursuant to Rule 12(b)(6) is appropriate only if the plaintiff can establish no set of facts in support of her claim that would entitle her to relief. *Noland v. McAdoo,* 39 F.3d 269, 273 (10th Cir.1994). In making this determination, a court must take all well-pleaded facts as true and construe them in the light most favorable to the plaintiff. *Rocky Mountain Helicopters, Inc. v. Bell Helicopter Textron, Inc.,* 24 F.3d 125, 128 (10th Cir.1994).

### 1. EPEC's Motion to Dismiss Count I (Breach of an Implied Contract)

In Count I, the City alleges that after expiration of the second franchise agreement, EPEC continued to "occupy, use and rent" the City's rights-of-way. Therefore, the City asserts that EPEC's conduct in continuing to use the City's thoroughfares on the same terms and conditions as the expired agreement gives rise to an implied contract. (Compl. at ¶¶ 39–41).

■ EPEC primarily seeks dismissal of the breach of implied contract count by arguing that the City's sole remedy at law is inverse condemnation. Inverse condemnation is a statutory action available to a property owner when the taker of the property, an entity with condemnation authority, does not intend to bring eminent domain proceedings. N.M.STAT.ANN. § 42A–1–29 (1994 Repl.Pamp.) (New Mexico Inverse Condemnation Statute). If inverse condemnation applies to a given situation, then it is the plaintiff's exclusive remedy. *Townsend v. State ex rel. State Highway Dept.,* 117 N.M. 302, 304, 871 P.2d 958, 960 (1994).

■ Inverse condemnation, however, is not applicable to the instant case. First, inverse condemnation requires, *inter alia,* that the condemnee's property be damaged. *See McClure v. Town of Mesilla,* 93 N.M. 447, 601 P.2d 80 (Ct.App.1979). EPEC has not taken or damaged any City property in light of EPEC's continued use and operation of the electric franchise under the terms and conditions of the parties' franchise agreement. In other words, there has been no "taking" by EPEC; it has continued to use the City's rights-of-way as it did prior to the present controversy. Second, it would be quite a stretch to label EPEC as a "condemnor" when EPEC continues to use city property in much the same manner as it has for the past fifty years. Therefore, EPEC's assertion that the City's sole remedy is inverse condemnation lacks merit.

■ EPEC also seeks dismissal of the City's breach of implied contract claim on the basis that rather than pleading for breach of an implied-in-fact contract, the City actually pleads a breach of an implied-in-law contract (unjust enrichment). The City already pleads unjust enrichment in Count III of its complaint. An implied-in-fact contract arises when the parties have expressed mutual assent through their conduct or actions. *Trujillo v. Chavez,* 76 N.M. 703, 706, 417 P.2d 893, 895 (1966). Conversely, an implied-in-law contract is one imposed by a court exercising its equitable powers to avoid an unfair result, i.e., to avert the unjust enrichment of a party. *Hydro Conduit Corp. v. Kemble,* 110 N.M. 173, 179, 793 P.2d 855, 861 (1990).

■ EPEC asserts that there was no mutual assent of the parties, no "meeting of the minds," due to EPEC's unequivocal refusal to pay the franchise fee in the absence of a franchise agreement. This is not a viable argument for purposes of seeking dismissal. It is clear that the assent of the parties need not be explicit and that assent can be implied by the conduct or actions of the parties. *Medina v. Sunstate Realty, Inc.,* 119 N.M. 136, 139, 889 P.2d 171, 174 (1995). EPEC's behavior since the expiration of the franchise agreement may be enough to factually sup-

port a claim for breach of an implied contract.

It is well-settled that a complaint will not be dismissed for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The City's claim for breach of an implied contract withstands this test. Therefore, EPEC's motion to dismiss the City's breach of an implied contract count is denied.

### 2. EPEC's Motion to Dismiss Count II (Specific Performance)

EPEC also seeks to dismiss the City's specific performance count on the basis that the City's sole remedy is an inverse condemnation action. For the reasons set forth in the previous section on breach of an implied contract, EPEC's attack based on the exclusivity of an inverse condemnation proceeding lacks merit and cannot serve as a basis for dismissing this count.

However, EPEC also seeks dismissal of the specific performance count because the City seeks monetary damages in the other counts in the complaint. To constitute a viable suit for specific performance, a claimant must allege that she has performed her part of the contract or that she is ready, able and willing to perform it. The claimant must also show that by her pleading she has a legally enforceable contract and has complied therewith by performing it or offering to perform. *Hilger v. Cotter*, 75 N.M. 699, 701, 410 P.2d 411, 413 (1966).

Another condition required to allege specific performance is that the remedy at law, such as damages, must be inadequate. *United Nuclear Corp. v. General Atomic Co.*, 96 N.M. 155, 252, 629 P.2d 231, 328 (1980), *cert. denied*, 451 U.S. 901, 101 S.Ct. 1966, 68 L.Ed.2d 289 (1981). "To be adequate, the remedy at law must be as certain, prompt, complete, and efficient to attain the ends of justice as a decree of specific performance." *Id.*

In its complaint the City has sufficiently alleged, in order to withstand a motion to dismiss, that there may be a legally enforceable contract. The City may also be able to show that it has complied with the prior franchise agreement in all respects or, at the very least, has attempted to perform according to the terms of the now-expired agreement. However, the City has failed to demonstrate how a claim in damages would not provide complete relief. After all, the City is asking for EPEC to pay the City for use of City rights-of-way. Further, this amount is sufficiently ascertainable. Because the City has an available remedy at law which, if successful, would result in full and accurate compensation, a demand for specific performance is not available under the facts alleged in the complaint. Dismissal is appropriate where the "plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief." *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, Kan.*, 927 F.2d 1111, 1115 (10th Cir.1991). Therefore, EPEC's Motion to Dismiss is granted as to Count II of the City's complaint, the specific performance count.

### 3. EPEC's Motion to Dismiss Count III (Unjust Enrichment)

EPEC seeks dismissal of the City's unjust enrichment count on two grounds: (1) there is no legal precedent for the imposition of "uncollected taxes" in order to substantiate an unjust enrichment claim and (2) the federal district courts are precluded from impinging on any rate order by the Johnson Act, 28 U.S.C. § 1342 (1993).

On the "legal precedent" theory, EPEC seeks to characterize the uncollected franchise payments as "uncollected taxes." However, this is not what the City is attempting to collect from EPEC. Rather, the City seeks recovery of the value of the franchise fees, based on the fifty-plus years that EPEC has paid the City under the terms of the franchise agreements.

Under New Mexico law, it is clear that a theory of quantum meruit, or unjust enrichment, is distinct from contract. *Tom Growney Equipment, Inc. v. Ansley*, 119 N.M. 110, 112, 888 P.2d 992, 994 (Ct.App.

1994), *cert. denied*, 119 N.M. 168, 889 P.2d 203 (1995). It is a remedy created by courts for reasons of justice and equity, and requires the wrongdoer to make restitution to the aggrieved party. *Id. See also Hydro Conduit Corp. v. Kemble,* 110 N.M. 173, 175, 793 P.2d 855, 857 (1990).

 From the face of the City's complaint, it is clear that the City's unjust enrichment count should not be dismissed. The complaint asserts that EPEC is continuing to furnish electricity to municipal users, as it has for several decades, without paying franchise fees to the City. These fees were paid by EPEC to the City until quite recently. Further, the City alleges that EPEC continues to use the City's rights-of-way for its feeder lines, electric poles, etc., without providing compensation to the City. Dismissal is only appropriate if the plaintiff can establish no set of facts in support of her claim that would entitle her to relief. *Noland v. McAdoo,* 39 F.3d 269, 273 (10th Cir. 1994). Thus, Count III of the City's complaint sufficiently asserts that EPEC is being unjustly enriched at the City's expense. *See Tom Growney,* 119 N.M. at 112, 888 P.2d at 994.

 The second basis given by EPEC for dismissal of the unjust enrichment count is the Johnson Act, 28 U.S.C. § 1342 (1993), which provides:

[t]he district courts shall not enjoin, suspend, restrain the operation of, or compliance with, any order *affecting rates* chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision. . . . (emphasis added)

The rates charged by EPEC to its customers would not be changed, either directly or indirectly, by any ruling made by this Court. This is especially true when it is conceded by EPEC that the franchise fee amount paid under the terms of the franchise agreement has been used by the Public Utility Commission in order to calculate the rate charged to Las Cruces customers. (Tr. of Aug. 25 Mot. Hr'g at 12). Thus, if this Court were to order EPEC to make restitution to the City based on the unpaid franchise fees, there would be no basis for raising the electric

rates of users. Hence, the Johnson Act has no applicability or relevance to this case. For these reasons, EPEC's motion to dismiss the City's unjust enrichment claim is denied.

### 4. EPEC's Motion to Dismiss Count IV (Trespass)

EPEC sought dismissal of the City's trespass claim in its Motion to Dismiss before the Texas bankruptcy court by asserting that because trespass is a "local action," the claim could only be brought within the territorial boundaries of New Mexico, the state where the property is located. This issue has been made moot by the removal of the case to this Court.

At the motions hearing of August 25, 1995, EPEC conceded that its local action argument is no longer applicable to its case. (Tr. of Aug. 25 Mot. Hr'g at 13). EPEC did, however, assert an argument based on the exclusivity of the remedy of inverse condemnation. As discussed above, EPEC's inverse condemnation argument is without merit. Therefore, EPEC's Motion to Dismiss the City's trespass count will also be denied.

### B. *CONDEMNATION (95–CV–485)*

#### 1. *City's Motion for Abstention or Remand*

 The abstention doctrine allows "a federal court, in the exercise of its discretion, to relinquish jurisdiction where necessary to avoid needless conflict with the administration by a state of its own affairs." BLACK'S LAW DICTIONARY 9 (6th ed. 1990). The City requests that this Court abstain from deciding the case at bar and instead remand it to state district court because it involves a local issue with major repercussions for all of New Mexico. (Pl.'s Br.Supp.Mot. Abstention or Remand at 6–9).

 It is well-settled that a federal court has an obligation to exercise the jurisdiction conferred upon it and, therefore, abstention is the exception rather than the rule. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). *See also Meredith v. Winter Haven,* 320 U.S. 228, 234, 64 S.Ct. 7, 11, 88 L.Ed. 9 (1943). Further,

the policy underlying diversity jurisdiction is that bringing cases in federal court protects out-of-state litigants from the dangers of local bias.

Finally, it appears from the parties' briefs that both concur that certification is preferred over abstention. In fact, City's counsel stated at the motions hearing that "certification is really a form of abstention...." (Tr. of Aug. 25 Mot. Hr'g at 85). In any case, this Court finds that to retain jurisdiction would not lead to unnecessary friction with state law or with local factors at issue. Therefore, the City's Motion for Abstention or Remand is denied.

### 2. *EPEC's Motion for Summary Judgment*

### A. Standard for Summary Judgment

A motion for summary judgment should be granted only where no genuine issue of material fact exists, entitling the movant to judgment as a matter of law. FED.R.CIV.P. 56; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The burden of establishing the absence of a material question of fact is on the moving party. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608. That burden may be discharged by showing that there is an absence of evidence to support the nonmovant's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 321, 106 S.Ct. 2548, 2551–52, 91 L.Ed.2d 265 (1986). Once the movant meets its burden, the burden shifts to the nonmovant to demonstrate a genuine issue for trial on a material matter. *Bacchus Industries, Inc. v. Arvin Industries, Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmovant may not rest on its pleadings, but must set forth specific facts showing there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553. Should a nonmoving party make some showing on an issue of material fact, the court must consider the standard of proof in the case and decide whether the showing is sufficient for a reasonable trier of fact to find for the nonmovant on that issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). A mere scintilla of evidence in the nonmovant's favor is insufficient to withstand the motion. *Id.* at 251, 106 S.Ct. at 2511–12. Thus, the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2511–12. The facts must, however, be construed in favor of the nonmovant. *Deepwater Investments, Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991); *Luckett v. Bethlehem Steel Corp.,* 618 F.2d 1373, 1377 (10th Cir.1980).

### B. Overview of the Parties' Assertions

EPEC filed its Motion for Summary Judgment on May 3, 1995. It subsequently filed a Corrected Memorandum in Support of its Motion for Summary Judgment on May 30, 1995.

In its Corrected Memorandum, EPEC contends that the City is barred from condemning the EPEC electric utility system because of what EPEC calls the "prior public use doctrine." This doctrine, according to EPEC, precludes condemnation by a municipality of property already devoted to a public use unless a statute expressly or by necessary implication grants condemnation authority. EPEC then argues that the City lacks the statutory authority essential to allow condemnation of property of a public electric utility.

In its response, the City contends that it has the necessary authority to condemn EPEC's electric utility property via state statutes, its home rule charter and the New Mexico constitution. The City also maintains that EPEC's interpretation of the prior public use doctrine is incorrect, and also inapplicable to the instant case because the City seeks to put the condemned property to the same use after condemnation.

### C. Review of New Mexico Case Law

Both parties are in agreement that the question before this Court is one of first impression in New Mexico. The precise question is as follows:

Does a municipality have express statutory authority or authority by necessary implication to condemn the property of an electric utility currently devoted to a public use and, if not, does general condemnation authority suffice if the municipality intends to use the condemned property for the same public use?

There are two New Mexico cases which touch on this issue, both having been decided more than seventy years ago. The first is *City of Albuquerque v. Garcia*, 17 N.M. 445, 130 P. 118 (1913). In *Garcia*, a municipality sought to condemn a community irrigation ditch, or acequia, for the purpose of widening a street. The court first ruled that the acequia constituted a public use. *Id.* at 450, 130 P. at 123. The court then stated the rule regarding condemnation of property already devoted to a public use:

> It is our view, therefore, that the use to which the irrigation ditch in question was devoted, was a public use, and consequently the city would not have the right to condemn the same and thereby destroy it, unless such right was expressly or by necessary implication conferred upon the City by the Legislature.

*Id.*

A careful review of the holding in *Garcia* raises two fundamental issues. First, in order to abrogate the prior public use doctrine, the legislative intent must be expressed in "clear and express terms, or must appear from necessary implication." *Id.* at 451, 130 P. at 124. Thus, a statute which gives municipalities general eminent domain powers will not be sufficient to allow condemnation of an existing public use. Another issue apparently decided in *Garcia* is that the prior public use doctrine only applies when a public entity's condemnation of the existing public use property will result in *destruction* of the prior use. *Id.* at 450, 130 P. at 123. Therefore, *Garcia* establishes a two-part inquiry for determining whether condemnation of a prior public use will be allowed: (1) to invoke the prior public use doctrine, the property to be condemned must

be "destroyed" and (2) if there is "destruction," there must be express statutory authority or statutory authority by necessary implication in order to allow a public body to condemn property being used for a prior public use. *Id.*

The only other New Mexico case which offers some guidance is *City of Raton v. Raton Ice Co.*, 26 N.M. 300, 191 P. 516 (1920), where a municipality instituted condemnation proceedings to acquire a reservoir and a pipeline right-of-way from a public waterworks system. There, the court acknowledged the rule in *Garcia*: that in the absence of express legislative language, a public body may not condemn property devoted to a public use where the first public use would be "obliterated or destroyed." *Id.* at 307, 191 P. at 523. However, in *City of Raton* the court reached a different result from *Garcia* because the city was going to use the property in question jointly with the waterworks company.[1] *Id.* Hence, there was no destruction or obliteration of the existing public use. Because the joint uses were not mutually exclusive, the court was not required to examine whether express statutory authority for the condemnation existed.

### D. Review of New Mexico Municipal Condemnation Statutes

Clear direction on the issue of what constitutes "clear and express statutory authority, or authority by necessary implication" cannot be found in either *Garcia* or *City of Raton*. However, at least one Missouri case offers helpful guidance on this question. In *State ex rel. Missouri Cities Water Co. v. Hodge*, 878 S.W.2d 819 (Mo. 1994) (en banc), the Missouri Supreme Court opined that statutory language such as "the right to condemn," "the right to acquire by eminent domain," "the right of eminent domain to take any waterworks," "the right of eminent domain for the purpose of taking a utility or part thereof," "a waterworks district may expropriate any existing waterworks system," "to condemn any such public

1. It should be noted that the waterworks utility company did not rebut the city's contention that there would be joint use of the condemned prop-

erty, but instead relied solely on its amended answer. *Id.* at 307, 190 P. at 523.

utility," or "to acquire by exercise of the right of eminent domain any public works" is required to allow a public body to condemn property already devoted to a public use. *Id.* at 824.

There are three New Mexico statutes which pertain to municipal acquisition of an electric utility system. The first is N.M.STAT.ANN. § 3–24–1(A) (1995 Repl. Pamp.), which provides that

> Any municipality may, by ordinance [2], acquire, operate and maintain an electric utility for the generation and distribution of electricity to persons residing within its service area.

Interpretation of this statute and its relationship to the prior public use rule hinges on the interpretation given to "acquire." There is no New Mexico case which has discussed the meaning of "acquire" as it applies in this statute. However, by utilizing the guidance given in *Hodge*, it becomes clear that the language in this statute, standing alone, does not provide express statutory authority, nor authority by necessary implication, to allow condemnation of an existing public electric utility system.

A second relevant statute is N.M.STAT. ANN. § 3–24–5 (1995 Repl.Pamp.):

> Any municipality owning, operating or proposing to construct an electric utility has the power of eminent domain for the purpose of acquiring property for the use of the electric utility according to the procedure for condemnation as provided by the Eminent Domain Code.

This statute's key language centers on "to construct an electric utility." "Construct" means "to make or form by combining or arranging parts or elements." MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 248 (10th ed. 1995). Hence, it is clear that condemning an existing public utility and planning to use the condemned property in the exact same fashion does not encompass "construction" of an electric utility. Moreover, by employing the rationale employed in *Hodge*, the language in § 3–24–5 is

insufficient to allow a municipality to condemn the property at issue.

A third statute that must be considered is N.M.STAT.ANN. § 42A–3–1(A)(7) (1994 Repl.Pamp.), which provides that "[p]roperty may also be condemned [by any municipality] for ... electric lines." This raises the issue of what constitutes "property." The language in this statute suggests that "property" is only real property and does not include existing electric utility lines, poles, stations, etc. In any case, this statutory language is vague and does not rise to the standard of express statutory language nor authority by necessary implication which is required to allow condemnation in the instant case.

This conclusion is supported by examining past acts of the New Mexico Legislature regarding public authority condemnation. For example, following the *Garcia* decision, where the New Mexico Supreme Court found statutory authority lacking for municipal condemnation of a ditch to widen a street, the legislature enacted N.M.STAT.ANN. § 42–1–28 (1978) (repealed 1981), which granted to municipalities the authority to condemn any "ditch, canal or acequia" within the municipality for the purpose of widening a city street. Hence, by this statute the Legislature explicitly and unambiguously provided cities, towns and villages with the authority to condemn acequias even when the first public use would be destroyed. Similarly, the 1994 amendment to N.M.STAT.ANN. § 3–27–2 (1995 Repl.Pamp.) explicitly granted municipalities the authority to condemn privately-owned water facilities. These two examples reflect that when the Legislature chooses to grant condemnation authority to municipalities, it does so in plain and unequivocal language. The three electric utility-related statutes, in contrast, do not employ such direct and unambiguous terminology. Therefore, all three New Mexico statutes relevant to this case, standing individually, fail to provide the City with authority to condemn EPEC's electric utility system within the municipality.

---

**2.** The City of Las Cruces passed Ordinance No. 1247 on September 3, 1991. It provides for the establishment of a city electric utility and pro-

vides the city utility with the power to acquire property by purchase or by condemnation.

However, these three electric utility condemnation statutes must be read together to discern whether the City of Las Cruces has the power to condemn. In *City of Raton,* the New Mexico Supreme Court construed three eminent domain statutes together in order to determine whether a statutory grant of condemnation power existed. *City of Raton,* 26 N.M. at 305, 191 P. at 521. Even when this approach is employed, the three statutes, when construed together, still do not provide the high standard of express statutory authority required to give the City the power to condemn EPEC's utility system. Therefore, the Court finds that the City does not have the necessary legislative authority under New Mexico statutes to condemn EPEC's electric utility system.

**E. Home Rule Authority**

█ The City also maintains that it has appropriate condemnation power by virtue of Article X, Section 6 of the New Mexico Constitution, which provides for municipal home rule. The relevant provisions of that article state that a home rule municipality "may exercise all legislative powers and perform all functions not expressly denied by general law or charter." N.M. CONST. art. X, § 6(D).

It is undisputed that the City is a municipal corporation with home rule authority. However, home rule status is not relevant to this case. There are no clear policy reasons for differentiating between charter cities and non-charter cities. Further, the City's position has been rejected in at least one case. In *City of Kirkwood v. Union Elec. Co.,* 896 S.W.2d 946, 947 (Mo.App.E.D.1995), a home rule municipality argued that the state home rule provision granted it condemnation power. In spurning this assertion, the court in *City of Kirkwood* noted that the Missouri constitutional home rule provision, which is much like the one in the New Mexico constitution, was "at best an implied grant of authority, not an express grant of such power." *Id.* This Court agrees that Article X, Section 6 of the New Mexico state constitution merely grants the City general powers and clearly does not constitute express statutory

authority nor authority by necessary implication to condemn EPEC's system.

It should also be pointed out that if, as the City contends, home rule authority is sufficient to allow municipal condemnation of public use property, then specific condemnation statutes would not be necessary. Therefore, the City's argument flies in the face of the rule in *Garcia* and *City of Raton* requiring specific statutory language. For these reasons, the Court finds that the City's home rule argument lacks merit and rejects the same.

**F. A Review of Cases in Other Jurisdictions**

Because of the complete absence of cases in New Mexico regarding public use condemnation of an electric utility by a municipality for the same use, it is helpful to review cases from other jurisdictions that examine this issue.

It should first be noted that there appears to be a prevalent view on public use condemnation by a municipality:

> As a general rule, property already devoted to a public use cannot be taken for another public use which will totally destroy or materially impair or interfere with the former use, unless the intention of the legislature that it should be so taken has been manifested in express terms or by necessary implication, mere general authority to exercise the power of eminent domain being in each case insufficient.

*State ex rel. Missouri Cities Water Co. v. Hodge,* 878 S.W.2d 819, 821 (Mo.1994) (en banc). *See also State ex rel. Schwab v. Riley,* 417 S.W.2d 1, 3 (Mo.1967) (en banc); *State ex rel. State Highway Comm'n v. Hoester,* 362 S.W.2d 519, 522 (Mo.1962) (en banc); *City of Kirkwood v. Union Elec. Co.,* 896 S.W.2d 946, 947 (Mo.App.E.D.1995); *City of Raton v. Raton Ice Co.,* 26 N.M. 300, 191 P. 516 (1920); *City of Albuquerque v. Garcia,* 17 N.M. 445, 130 P. 118 (1913); *St. Marys v. Dayton Power & Light Co.,* 607 N.E.2d 881, 886 (Ohio App. 3 Dist.1992); *City of Pryor Creek v. Public Service Co. of Oklahoma,* 536 P.2d 343, 346 (Okla.1975); 29A C.J.S. *Eminent Domain* § 58 (1992).

This general rule (the prior public use doctrine), by its own language, requires that a city have specific statutory authority or authority by necessary implication in order to sustain municipal condemnation of a public utility. However, it is equally clear that this rule applies only if there is destruction, obliteration or material impairment of the prior use. For example, in *Garcia* the rule was used to prevent the City of Albuquerque from condemning an acequia in order to widen a street because the new use would *destroy* the prior use. Conversely, in *City of Raton* the rule was deemed inapplicable to a situation where the municipality sought *joint* use of the waterworks system with the condemnee. Hence, the public use doctrine cannot be invoked against a condemnor municipality if there is no destruction, obliteration or material impairment of the existing use. In those instances, general statutory authority will suffice to grant a city the power to condemn a public utility system.

An examination of the cases that have considered the issue strongly suggests that joint or co-use of an electric utility system does not equal destruction, obliteration or material impairment of an existing public use. This exception to the public use doctrine has been called "compatible use." *See* Mark S. Arena, Comment, *The Accommodation of "Occupation" and "Social Utility" in Prior Public Use Jurisprudence*, 137 U.PA. L.REV. 233, 244 (1988). Under the compatible use exception, the condemnation is allowed if the proposed use will not materially impair or interfere with or is not inconsistent with the present use. *See Florida East Coast Ry. Co. v. Broward County*, 421 So.2d 681 (Fla.App. 4 Dist.1982); *Harrison County Sch. Bd. v. State Highway Comm'n*, 284 So.2d 50 (Miss.1973); 29A C.J.S. *Eminent Domain* § 58 (1992); 11 E. McQUILLAN, THE LAW OF MUNICIPAL CORPORATIONS § 32.72 at 413 (3d ed. 1983). The compatible use exception will apply even if the new use causes the previous user some inconvenience, so long as the two uses can stand together. 29A C.J.S. *Eminent Domain* § 58 (1992). *See also State ex rel. Wilcox v. T.O.L., Inc.*, 206 So.2d 69, 73 (Fla. App. 4 Dist.1968). In these instances, general condemnation authority is adequate to permit a municipality to condemn property of the previous public user. Therefore, a primary consideration for this Court is whether the City's proposed use of the electric utility will result in "destruction or material impairment" of EPEC's public use.

EPEC, however, argues that the issue of destruction or material impairment has no bearing in this case. In support of this position, EPEC primarily relies on *State ex rel. Missouri Cities Water Co. v. Hodge*, 878 S.W.2d 819 (Mo.1994) (en banc). There, the Missouri Supreme Court distinguished between an eminent domain action for a *different* municipal use and an action where the new user proposes to use the property for the *same* use. After acknowledging the general rule regarding destruction or material impairment, the court in *Hodge* found that "[a] municipality's condemnation of an entire public utility, already operating under a certificate of convenience and necessity, for the same use, is an extraordinary exercise of the power of eminent domain." *Id.* at 825. The court then went on to hold that the proposed condemnation of the waterworks system could only take place if the legislature provided clear and express authority. *Id.*

Although the court in *Hodge* declares its view on same use condemnation as the "majority rule," the decision raises more questions than it answers. In the first place, the cases cited to support the court's decision do not address any distinction between same use and dissimilar use: instead, these cases merely take a bright line approach by invoking the public use doctrine without any discussion of compatible use or same use. There is therefore no discussion in these cases of "destruction" or "material impairment." The policy underlying the decisions cited in *Hodge* is that there must be legislative authorization to take the public use property of one entity and give it to another without any benefit to the public. *Hodge*, 878 S.W.2d at 824. This stringent approach, of course, rests on the assumption that all same use condemnations will not benefit the public, a query which this Court will not presently address. Nevertheless, it is a factor which a court could consider in making its final determination.

A second question which must be examined is whether the *Hodge* view applies when a city wishes to condemn less than the entirety of an existing public utility. In *Hodge,* the city sought to condemn the entire waterworks system. Here, the City of Las Cruces only seeks to condemn EPEC's electric utility system within the municipal boundaries. Therefore, the rigid policy mechanically noted by *Hodge,* that there will be no public benefit if municipal condemnation is allowed, may not be applicable to the instant case.

The ruling in *Hodge* also may be limited to situations involving proposed condemnation of a waterworks utility operated under a certificate of convenience and necessity (CCN). In the instant case, it is disputed by the parties whether EPEC operates under a CCN. (Def.'s Corrected Mem.Supp.Summ.J. at 3); (Pl.'s Resp. to Mot.Summ.J. at 2). Thus, it may be relevant to ask whether the *Hodge* rule applies to situations where the existing utility is not operating under a public CCN.

In any case, it is clear that *Hodge,* rather than espousing the "majority" rule, actually represents only one side of the coin. There also exists a line of cases which hold that general condemnation authority suffices to allow a municipality to condemn an existing public utility for the same use. For example, in *City of Shakopee v. Minnesota Valley Elec. Coop.,* 303 N.W.2d 58 (Minn.1981), the Minnesota Supreme Court held that a municipality could condemn an electric utility by virtue of a general condemnation statute. After acknowledging the general rule that specific statutory authority is necessary when the planned condemnation is inconsistent with the previous use, the court in *Shakopee* held that where the condemned property would be used "in a manner identical to its current use," the proper rule is to allow municipal condemnation under a statute conferring general condemnation authority. *Id.* at 60.

The public policy advanced in the *Shakopee* decision is clear:

> If ... the purpose of such acquisition is to transfer the ownership and operation of such property from a public service corporation (which, although a quasi-public enti-

ty, is nevertheless a private corporation organized for profit) to a municipality or other purely public corporation, it has been held that the greater public use and increased public benefit which result from governmental operation justify such acquisition.

*Id.* at 60 (quoting 1 P. NICHOLS, NICHOLS ON EMINENT DOMAIN § 2.2(9) (1979)). The policy underlying *Shakopee* has been called the "More Necessary Use" test. Mark S. Arena, Comment, *The Accommodation of "Occupation" and "Social Utility" in Prior Public Use Jurisprudence,* 137 U.PA. L.REV. 233, 248 (1988). This test, therefore, is at odds with the policy argument advanced in *Hodge,* which was skeptical that a subsequent similar use of a public utility would result in benefit to the user public.

The court in *City of Palm Bay v. General Development Utilities, Inc.,* 201 So.2d 912 (Fla.App. 4 Dist.), *cert. denied,* 207 So.2d 452 (1967), also determined that municipal condemnation of an existing public use was authorized by a general condemnation statute. In that action, the court substantiated its decision by subscribing to the view that

> the larger public use and more general public benefit resulting from the operation of a public utility by a municipality or public corporation will warrant authorization to such municipality or public corporation to take property of a private corporation and devote it to a like purpose.

*Id.* at 916 (quoting 29A C.J.S. *Eminent Domain* § 75 (1965)). The court in *City of Palm Bay* also found that another important policy consideration is one of giving expression to the wishes of the citizenry through their elected representatives and that denying a municipal takeover of a utility for the same use would frustrate the voice of the electorate, whose "will should not be thwarted by the defendant merely because it got there first." *Id.*

## G. "Destruction, Obliteration or Material Impairment" of the Previous Public Use

The previous discussion illustrates that there is no majority rule on the issue of same use condemnation by a municipality. The

issue has also never been examined by any New Mexico court. In fact, it appears there is only one case that is moderately comparable to the instant case, where the Plaintiff City seeks to condemn only that part of the utility serving the municipality and where EPEC's electric utility system serves the City, Doña Ana County and other parts of southwestern New Mexico through an integrated system.

In *City of Kirkwood v. Union Elec. Co.,* 896 S.W.2d 946 (Mo.App.E.D.1995), a city sought to condemn that part of an existing utility that served city residents. The court in *City of Kirkwood* decided to follow the *Hodge* rationale by stating in dictum that "[i]t would appear to be an even more 'extraordinary exercise' of eminent domain to allow a single municipality to condemn a portion of a utility which serves a very large number of customers outside the municipality's limits." *City of Kirkwood*, 896 S.W.2d at 947. However, it is unclear from the opinion in *City of Kirkwood* whether the electric system serving Kirkwood and the surrounding community was an integrated system with interconnected lines, as is alleged to be the case in the instant action. Moreover, dicta from an intermediary court in another jurisdiction is not compelling authority.

In any case, the factual determination which must be made before attempting to apply the general rule on prior public use set forth in *Garcia*, is to ascertain whether the City's condemnation of EPEC's electric system within the municipality constitutes "destruction, obliteration or material impairment" of the existing use. This factual determination must be resolved before a decision can be made by this Court or before there can be certification to the New Mexico Supreme Court.

■ In order for there to be a meaningful discussion of the question at issue, the Court must first define "destruction, obliteration or material impairment." It is urged by EPEC that "destruction" has occurred here because EPEC will no longer be serving municipal users, i.e., a different entity will be serving city residents. (Tr. of Aug. 31 Hr'g at 10–11). This position is not supported by the relevant case law. For example, in *Gar-*

*cia* the New Mexico Supreme Court barred municipal condemnation of an irrigation ditch because the city's proposal to widen the street and the community's continued use of the ditch could not stand together. *City of Albuquerque v. Garcia,* 17 N.M. 445, 453, 130 P. 118, 120 (1913). Thus, the "destruction" of the ditch entailed the public no longer deriving the benefits from continued operation of the ditch for irrigation purposes. The relevant query, therefore, is how a proposed use will affect the public and whether the community will be precluded from deriving benefit from that prior use. Hence, the identity of the new operator of the public use has no bearing on the issue of destruction, obliteration or material impairment of the prior use.

■ It may be that a City takeover of the municipal electric system will have some effect on EPEC's continued obligation to serve ratepayers outside the municipal limits. For example, if the City condemnation were allowed to proceed, EPEC may be required to construct new transmission lines, substations, etc., in order to continue service to other customers. It is not enough, however, that some inconvenience may occur to the prior user; to constitute destruction, obliteration or material impairment, there must be strong evidence that the new use will eradicate or materially impair the prior use. *See, e.g., Georgia Southern & Florida Ry. Co. v. State Road Dept.,* 176 So.2d 111, 112 (Fla.App. 1 Dist.1965); *Harrison County Sch. Bd. v. State Highway Comm'n,* 284 So.2d 50, 53 (Miss.1973); *St. Marys v. Dayton Power & Light Co.,* 79 Ohio App.3d 526, 607 N.E.2d 881, 885 (3 Dist.1992); 29A C.J.S. *Eminent Domain* § 58 (1992); 1 E. McQUILLAN, THE LAW OF MUNICIPAL CORPORATIONS § 32.72 at 413 (3d ed. 1983); Mark S. Arena, Comment, *The Accommodation of "Occupation" and "Social Utility" in Prior Public Use Jurisprudence,* 137 U.PA.L.REV. 233, 236 (1988).

■ Conversely, if the two uses can stand together or if there is only some inconvenience caused to the prior user, then the condemnation will be allowed to proceed because there has been no "destruction." *See*

*State ex rel. Wilcox v. T.O.L., Inc.*, 206 So.2d 69, 73 (Fla.App. 4 Dist.1968). In *St. Marys v. Dayton Power & Light Co.*, 79 Ohio App.3d 526, 607 N.E.2d 881 (3 Dist.1992), the court allowed condemnation of a portion of an easement by a municipality because the prior user could still service its power lines from the remainder of the easement. The justification given by the court was that the new use would not totally destroy or materially impair the prior use. *Id.* 607 N.E.2d at 885. Therefore, it is clear that some inconvenience to the prior user caused by the new use does not rise to the level of destruction, obliteration or material impairment of the prior use.

Similarly, a Florida appellate court in *Florida East Coast Ry. Co. v. Broward County*, 421 So.2d 681 (Fla.App. 4 Dist.1982), concluded:

> . . . when a taking will not materially impair or interfere with or is not inconsistent with the existing use, and the proposed use is not detrimental to the public, then a court possesses authority to order a taking of the property.

*Id.* at 683. Thus, where there is no destruction or material impairment, a municipality will be allowed to exercise general powers of eminent domain to accomplish the taking.

Although EPEC has primarily relied on a Missouri case—*Hodge*—to argue that the City of Las Cruces cannot take EPEC's municipal utility property, there is another case from Missouri which also espouses the non-destruction exception. In *State ex rel. Maryland Heights Fire Protection Dist. v. Campbell*, 736 S.W.2d 383 (Mo.1987) (en banc), the Missouri Supreme Court first stated the general view that "public property held by a political subdivision cannot be acquired by another political subdivision if the proposed use will totally destroy or materially impair or interfere with the former use." *Id.* at 385. The court then stated that

> The logical corollary of this rule is that if the proposed use does not totally destroy or materially impair or interfere with the existing use, the public property can be acquired by another political subdivision to further serve a public purpose without express authority by the legislature.

*Id.* This opinion further substantiates the view that in order to invoke the prior public use doctrine, there must be a showing that the subsequent use by the proposed condemnor must have the effect of destroying or materially impairing the prior use.

■■■ Therefore, the factual issue before this Court is whether the City's proposed use of the condemned property would result in destruction, obliteration or material impairment of the prior use. As discussed earlier, this question must be analyzed from the perspective of the user public.

On the destruction question, the parties are in complete disagreement. On one hand, the City has submitted an affidavit from Timothy R. Corrigan, an electrical engineer retained by the City to provide consulting services in utility operations, rates, power supply and utility planning. (Corrigan Aff. Ex. 2 at 1–2). In his affidavit, Corrigan states that if the City successfully acquires the municipal electric franchise, the severance of the municipal system from the remainder of EPEC's system will (1) ensure that EPEC's customers will not be denied access to electricity; (2) not impair access to EPEC's system by any customer of EPEC; and (3) be designed to minimize construction and costs. *Id.* at 2. Therefore, Corrigan's affidavit supports the contention that condemnation of municipal electric utility property will not result in "destruction or material impairment" to EPEC's remaining system or to EPEC's remaining customers.

In sharp contrast to the opinion expressed by Corrigan, EPEC has submitted an affidavit from Robert C. McNiel, EPEC Vice–President, in which he concludes that condemnation of the municipal electric system by the City will result in EPEC having to construct new transmission lines, substation lines and distribution lines in order for EPEC to serve its other New Mexico ratepayers. (McNiel Aff. at 2). However, McNiel's affidavit does not mention with specificity how many lines would have to be built by EPEC after the City condemns the municipal property. This leaves unanswered whether the City's proposed condemnation of the municipal system would merely *inconve-*

*nience* EPEC in serving its customers outside of Las Cruces or whether condemnation would *destroy* the prior use for the public. Hence, this affidavit does not address the factual issue before this Court: whether the City's condemnation of the municipal system would destroy or materially impair the public's prior use.[3]

In any event, based on these affidavits, oral argument and the submissions of the parties, it is clear that a genuine issue of material fact exists as to whether the proposed condemnation of EPEC's municipal utility property will destroy or materially impair the public's use of that property. As set forth in *Garcia* and *City of Raton,* destruction or obliteration of the existing use is necessary to invoke the prior public use doctrine, and this issue is contested in the case at bar. A motion for summary judgment will be granted only where no genuine issue of material fact exists. FED.R.CIV.P. 56; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Consequently, EPEC's Motion for Summary Judgment in 95–CV–485 is denied.

### 3. *EPEC's Motion for Certification*

On June 19, 1995, EPEC filed a Motion for Certification of the principal legal question in this case to the New Mexico Supreme Court. As a basis for granting this Motion, EPEC has asserted that (1) there is no New Mexico decision which directly addresses the issue of a municipality's authority to condemn an existing electric utility system; (2) the question is an important matter with significant implications for the public; and (3) certification would advance final judicial resolution of this case.

Certification of a question to the New Mexico Supreme Court is governed by N.M.STAT.ANN. § 34–2–8 (1994 Cum. Supp.), which provides that a question may be certified to the state Supreme Court by a federal court if:

1. the question(s) involves propositions of New Mexico law which are determina-

tive of the cause before the federal court; and

2. there are no controlling precedents in decisions of the New Mexico Supreme Court or the New Mexico Court of Appeals.

*Id.*

The New Mexico Supreme Court has promulgated the following rules regarding certification of a question by a federal court to the state Supreme Court:

1. Certification can only be invoked by a federal court by a written request; and

2. The certification request must contain:
 a. the complete style of the case, including attorneys' names and addresses;
 b. the question of law to be answered; and
 c. either a statement by the certifying court of the facts relevant to the question or a stipulation of facts by the parties and approved by the certifying court.

SCRA 12–607.

The most crucial component of the certification process is to provide the New Mexico Supreme Court with sufficient factual information to allow for a determinative resolution of the certified legal question. *See Schlieter v. Carlos,* 108 N.M. 507, 775 P.2d 709 (1989). The submitted facts must be sufficiently nonhypothetical and evidentiary. *Id.* at 509, 775 P.2d at 711. Thus, the state Supreme Court will not give a ruling based on insufficient facts and consequently provide what in essence is an advisory opinion.

*Schlieter* is the case which best explains the certification process. There, the United States District Court for the District of New Mexico certified questions to the New Mexico Supreme Court on the validity of the Medical Malpractice Act under the New Mexico Constitution. In deciding not to rule on the certified questions, the New Mexico Supreme Court pronounced that a sufficient factual predicate must be laid before a certified

---

3. It should be pointed out that McNiel's affidavit does not mention McNiel's area of expertise, training or education. Therefore, it is difficult

for the Court to assess the weight that should be given this affidavit by virtue of McNiel's background.

question will be accepted. *Id.* at 509–10, 775 P.2d at 711–12. Simply put, the New Mexico Supreme Court will not base a decision "upon anecdotal and speculative argument." *Id.* at 510, 775 P.2d at 712.

In *Schlieter,* the New Mexico Supreme Court added two additional requirements for certification:

1. that answering the certified question will increase the likelihood of judicial expediency in resolving the underlying litigation; and

2. the certified question must present a significant question of state constitutional law or be of significant public interest.

*Id.* at 511, 775 P.2d at 713.

These stringent requirements for certification to the state Supreme Court underscore the absolute necessity of developing a detailed factual record prior to certification from a federal court to the New Mexico Supreme Court. Therefore, any federal court considering the certification of a question to the New Mexico Supreme Court must first resolve all relevant factual disputes that are necessary to resolve that question. This can be done either by stipulation of the parties or by the federal court conducting an evidentiary hearing on the disputed issues. Based on the record before the Court, there is no question that the parties in the instant action disagree on whether the proposed condemnation by the City will destroy or materially impair EPEC's service to nonmunicipal users.

Whether this Court decides the ultimate issue or certifies that decision to the New Mexico Supreme Court, it will be necessary to conduct an evidentiary hearing on the issue of destruction, obliteration or material impairment of the prior public use. Because it is essential to conduct this evidentiary hearing regardless of this Court's ruling on the certification issue, the Court at this time reserves ruling on EPEC's Motion for Certification to the New Mexico Supreme Court. An evidentiary hearing on the issue of destruction of the prior use will be conducted at the earliest possible date.

*CONCLUSION*

**IT IS HEREBY ORDERED THAT:**

1. Defendant EPEC's Motion to Dismiss in 95–CV–385, filed March 24, 1995, in U.S. Bankruptcy Court [in Doc. # 1] is granted as to Count II of the City's Complaint (Specific Performance), but denied as to all other counts.

2. EPEC's Motion to Consolidate 95–CV–385 and 95–CV–485, filed May 4, 1995, [Doc. # 7 in both cases] is denied.

3. Plaintiff City's Motion for Abstention or Remand in 95–CV–485, filed May 30, 1995 [Doc. # 16] is denied.

4. EPEC's Motion for Summary Judgment in 95–CV–485, filed May 3, 1995 [Doc. # 3] is denied.

5. The Court reserves ruling at this time on EPEC's Motion for Certification to the New Mexico Supreme Court in 95–CV–485 [Doc. # 26] pending a factual determination on the issue of destruction, obliteration or material impairment of the existing use.